3144 Black v. Department of Homeland Security Good morning. Please proceed. May it please the Court. Good morning, Your Honors. Michael Berenik on behalf of the appellate James Black. Your Honors, as you know, this case came out on the Merit Systems Protection Board. The first argument that we put forward in our brief was one that we raised at the board level. We also raised with the administrative judge had to do with the issue of the marital communication privilege and whether there was a waiver or not. In the underlying case before the administrative judge, I believe the judge failed to recognize the fact that it was a compelled interview, that it was not a voluntary interview. She seemed to take the position that Mr. Black could walk out of the interview at any time, stop the interview. That's not the case we have here. In fact, it was a compelled interview, Mr. Black. What do you mean compelled interview? I'm not sure how you're using that term. He was ordered under the confines of Garrity and also under the confines of Kalkines to come in and answer the investigators' questions, as opposed to some of the cases that the government cited in their brief, where it was a truly voluntary interview. In one case, the defendants were being interviewed by the Secret Service. They were free to leave at any point, free not to answer any questions, without any repercussions. In this case, Mr. Black did not have that privilege. Why not? I don't understand. Why couldn't he have walked out? If he did walk out... He's not in custody, right? Correct. He's not in custody, but his job was... Not under subpoena. Essentially, he was. The agency... A subpoena is a legal instrument. There's no subpoena in this case. He was asked to come in for an interview. He could walk out, I think. And if he walked out, he was subject to termination. He was subject to discipline. Of course, but he can make his choice. He can walk out or he can stay. He can answer questions or not. There may be risks to the choice he could make, but he still had those choices, it seems like to me. Correct, and that goes to the coercion address that he was under during the interview. During the interview, his job was on the line. He was a lifelong government employee, and if he walked out of the interview, he was subject to insubordination. He would be fired for walking out of the interview. He knew that. It was his job to investigate. What's your basis for saying that he could be fired if he walked out of the interview or declined to answer a particular question? They served him with a notice saying he had an obligation to answer the investigators' questions, and if he did not answer the investigators' questions, he was subject to discipline up to and including termination. He was an investigator with the Office of the Inspector General for his entire civilian career with the government. He investigated the exact same thing that he was being investigated for. He knew the repercussions if he walked out of the interview. But Garrity has nothing to do with that scenario. Garrity, in this scenario that you had, your client was actually shown a document that he agreed to that he wasn't going to be pressed with criminal charges. Correct. So you don't have at all the same scenario that you could compare a Garrity line of cases with. I would respectfully disagree. Under the Garrity line of cases, there was the potential for the criminal prosecution and... Which is not here at all. No. Initially, it was. During the first two attempts to interview Mr. Black, the investigators came, attempted to obtain a voluntary statement from Mr. Black. He said, I'm not going to answer your questions until I'm compelled to answer your questions. That's finally what we have the October interview. There was no risk of criminal prosecution, which he was informed of prior to the interview and which he acknowledged prior to speaking, right? Correct, on the October interview, yes. Okay. Well, this is the interview that you're concerned about, right? Correct. The interview where the phone call was made? Yes. Okay. And during that interview, he did not have the right to refuse to answer the investigators' questions. If he did, he would be insubordinate and subject to discipline, up to and including termination. That's where we come back to the duress and coercion that he was under. It was not in any sense a voluntary statement or a voluntary... But what was the duress? The fact that if he walked out of the interview, he would have been fired, terminated? Yes. And if he stayed and gave truthful answers, he would not be? Well, he would face the repercussions of whatever he said as far as truthful answers. But he had to give truthful answers during the interview? Correct. So what is the problem? He came in voluntarily. There was no criminal overhang action against him at that point in time, and he was asked certain questions. And those questions had to be answered truthfully. I don't know if I misunderstood, Your Honor, if you said he came in voluntarily or he came in involuntarily. Well, either way, let's say he came in involuntarily. Which I believe... He was asked to come in. Correct. Does it make any difference if he came in voluntarily? I believe so. I believe if he came in voluntarily without the order from his agency to answer the questions, that takes it more into the line of the cases that the agency, then government, has cited where people are voluntarily giving statements to the Secret Service, and they waive their communication privilege. That's not the case we have here. He did not come in voluntarily. He did not say, please come and interview me. I'd like to tell you what I have to say about this situation. The only reason he was there on, finally, the third occasion was because his agency ordered him to be there involuntarily. He wasn't there voluntarily giving the statement. He was giving the statement. How does that translate into coercion? I believe that's what was recognized by the Garrity Court. The Garrity Court said that that is coercion when you're given the choice between relinquishing your rights or your job. That's coercion. Because he does not have the right to do that. You're talking about the criminal context, which we don't have here, as Judge Kendall keeps pointing out. I understand that, but I believe the court was facing the exact same issue in Garrity as the employee was given the choice of answer the question or lose your job. The Garrity case law, of course, is that that coerced statement then should not be used in the criminal context to incriminate the individual. He doesn't have any potential to incriminate himself in a criminal context because they've already told him. It was even presented to the U.S. Attorney's Office. They declined to prosecute and said it would be better handled as an administrative matter. So the administrative matter is where you stand. That's the be-in-the-end to all of it. Correct. But that's where we get to the government's position is that Mr. Black waived his marital communication privilege. Okay. And I don't believe there was a waiver here because the government ordered him to answer the questions. Didn't he pick up the telephone himself? That was after the investigator pressed where did he get the information. They were dissatisfied. He didn't answer the question at first? Correct. He stuck with his original response was that the information came from public sources. And did the agents, did the EPA agents press the speakerphone button or did he? No, he pressed the speakerphone. So he put his wife on the speakerphone to discuss with her what happened and what the source of his Social Security number was and she stated it was from the trash run. She stated that the information she faxed him that morning was from the trash run. Okay. To date, nobody has been able to the neighbor's complaint. Correct. But that wasn't the basis of the termination, right? The basis of the termination was the inconsistent answers regarding the access to the computer database, right? There's two issues. There's the computer database and then there's the personal identifying information. The complainant alleged that he used government databases to obtain her Social Security number and date of birth. Right, but the finding or the reason for his dismissal wasn't that they proved that the neighbor's Social Security number was accessed. No one ever has determined that. Correct. But the basis were instead that during our attempts to determine whether you did that, you were not forthright with this and you gave us inconsistent answers, right? Not inconsistent that he misled the investigators. Right, because at one point he said it came from a public database and at another point he said it came from the trash run, from his wife's trash run. Correct. And to date he still does not know whether it came from the public database or from the trash runs. All of the documents that he has, all of the documents that are before the court, none of them predate the lien application. But he never disclosed to the agents early on that there was another source other than the public databases. No, he didn't know about the other source until the day of the interview, until the October 6th interview. And just so I understand the conference room, the EPA agents are there and he presses the telephone and contacts his wife and her answers are open to everyone in the room, correct? Correct, but that was only after the fact where the EPA investigators pressed on that they were dissatisfied with his answer that the information came from public sources or came from his wife. That's when he pushed the button, handed them the documents. That's when it came out that she had been doing the trash runs. That was the extent of the phone call. If you read the court decision, it was a very short phone call. But the only reason he disclosed that information to the investigators is because they were dissatisfied with his responses up to that point. What's your point? That somehow it's improper because it was preceded by the investigators saying they were dissatisfied with his earlier answer about public sources? My point is that there was no voluntary waiver by Mr. Black. Why not? I'm trying to understand what the cause and effect is. You're saying because they told him they were dissatisfied with his answers, that meant when he picked up the phone somehow it was involuntary. That doesn't make any sense to me. I don't see how the one follows from the other. He had to keep answering their questions until they were satisfied. They were not satisfied up to that point that the information came from public sources. They kept pressing on, pressing on, pressing on. So it was a coerced waiver? Is that the concept? Yes. They coerced his wife or make his wife speak to them, right? No. They didn't make him tell them what his wife said. He volunteered it, right? I don't believe he volunteered it. They did make him tell what his wife told him. They want to know the source of the information and that's when it came out, the conversation between he and his wife. Well they heard it because the telephone was on a conference button. He told them before they went on the conference call. He handed them the documents, said they came from my wife. This is some of the information. She faxed me this morning and then he put them on the conference call. So the disclosure was before the telephone call. There's no dispute there as far as the initial disclosure was before the telephone call. How does that add up to coercion? It looks to me like he's a free actor at every stage. He's not a free actor, your honor. He had no real right to walk out of that room. If he did. We're not talking about walking out of the room. He turns over some documents and then he puts his wife on the phone. How is either of those things coerced? I just don't get it. Because the plain language of the document they handed him said you have to answer our questions. So? That doesn't mean you have to call your wife. It doesn't mean you have to turn over certain documents. If you don't answer our questions, you're subject to discipline up to including termination. The Garrity Court recognized that's not a real choice. That's the same choice Mr. Black was facing. If you don't answer our questions, you're subject to discipline up to including termination. If Garrity applies, he might win, but I think you're having a hard time convincing anybody in this panel that Garrity is even close to applicable. The administrative law judge made some credibility findings as well in the record regarding his answers regarding the source of the social security numbers, correct? Yes. Found him to be less than credible. And those should stand for this court when we review whether in the abuse of discretion standard, correct? My recollection of the judge's findings is that she found it hard to believe that Mr. Black would not have known that information. That's the extent of her finding as far as a credibility determination as far as when the discussion as far as the trash runs were or would not have known where he got the social security numbers. Would not have known where his wife obtained the social security number. And Mr. Black's position was the opposite. I've been married to her for 30 years. I trust her. I know she's not going to do anything illegal. When I ask her to do this research for me and she gives me the information, I can trust that it's not anything illegal. And was he afraid that it was illegal to do a trash run? No, he was absolutely, he was absolutely certain it was he did trash runs as part of his job as an internal affairs investigator. Well, doesn't that just support the strange inconsistency with his refusal to give that information since he knows it's legal activity and there's no privacy interest? No, he did not understand that his wife was doing trash runs until the day of the interview. Right, but what you're saying to me is he knew that it was not illegal and so what's, doesn't that support the judge's until he felt pressured to do so? No, I don't believe so because during the interview, just before the disclosure, he said, I did not want to get my wife involved in this. And that's the whole purpose of the marital communications privilege is to protect your spouse, not have your spouse testify against you. So I believe it's absolutely consistent with his position that day. Well, if he didn't want to get his wife involved in it, it was inconsistent to press the speaker button. I see. Do you want to take the rest of your time for rebuttal? Yes, please. Thank you, Your Honor. Thank you. Ms. Hoshford, good morning. May it please the court. The court should affirm the board's decision because the board did not abuse its discretion in finding that Mr. Black had waived any marital communications privilege to which he may otherwise have been entitled. In addition, substantial evidence supports the board's finding that Mr. Black abused the agency's IDMS system. Did the board base its decision solely on this incident of this conversation or was the decision based in part upon those other moments where he accessed the computer database? She based her decision on both. She sustained both charges. She sustained the charge that he had misled the EPA investigators with respect to the source of Ms. Weisbrook's personal identifying information. She also sustained the charge that Mr. Black had misused the IDMS system by querying, among others, Ms. Weisbrook and his superiors. And the investigators in this matter as well? The investigator in the underlying matter as well? He did not query them. Okay. So in your brief when you set forth the various individuals that were part of his agency that were queried, was that part of the decision to discharge him? Yes. Okay. Yes, that was the case. The court has pointed out the phone call between Mr. and Black and his wife in the presence of the investigators isn't even subject to the merits of communications privilege. The privilege is negated by the fact that it wasn't confidential. Furthermore, before that, he had already told the investigators that his wife had obtained the information through trash runs. And before that, he had told the investigators that his wife had used only public sources, including the internet, to obtain the information. So once he disclosed part of what his wife had told him, then he waives the privilege as to all communications. You can't distort the truth by telling only just one part of the communication without disclosing the other part of the communication. In addition, Mr. O'Brien himself, during the reply to the notice of proposed removal, disclosed the same thing. He didn't assert a privilege on behalf of Mr. Black. Now Mr. Black's, so there were numerous instances of waiver, and in fact, as the court has pointed out, the phone call was not privileged. Mr. Black's claim that somehow he was entitled to guarantee protection, as the court pointed out, misses the mark. This was a Kalkine situation. The reason that investigators had not pressed Mr. Black for answers to questions in earlier visits was because he had, the criminal prosecution had not been declined, and he exercised his right to say, I won't answer questions until the criminal prosecution is declined. Once it was, then his, there was no threat of his Fifth Amendment right to self-incrimination being somehow violated in the context of this civil proceeding, and so. He clearly understood he had a right to decline those preliminary approaches by saying. He consulted with counsel about that. And by asserting then that I won't answer until I get the assurance from the U.S. Attorney's Office that I won't be prosecuted. That's exactly right. Once that assurance came through, the investigators came back and he signed the Kalkine's waiver, but I would, warning, but I would also note that before he signed the Kalkine's warning, he consulted with counsel again to make sure that the memorandum of understanding between the EPA and the DHS was still in effect. So he had counsel advice all throughout this. So had Mr. Black. He was an investigator himself. He was an investigator himself. Yes, he'd been an investigator for 27 years, and he was well versed in the so once the Kalkine's waiver was signed in this civil proceeding, he could be compelled to testify at threat of some sort of penalty, whether it be, you know, suspension or removal. That was, the Supreme Court has said that that's perfectly legitimate. So to say that he was somehow in, he somehow involuntarily agreed to the interview is both without basis in the record and in the law. I mean, and in his briefs, Mr. Black implied that the, he wouldn't have been allowed to waive, to assert his marital privilege, but there's no evidence to support that. He never even attempted to assert the marital privilege. I mean, either he knew he had the marital privilege and he asserted it, or he thought that he had to be truthful and he couldn't assert it, in which case he should have been truthful from the beginning. Instead, he misled the investigators by concealing the fact that his wife had gone on this trash runs and saying that he obtained the information only from public internet sources. That's at page JA-297 of the record. That's clear. Does this circuit recognize a crime fraud exception to the marital privilege? Do you mean in the context of a spousal testimony? Not, this court doesn't handle a whole lot of criminal cases, so it's not something that comes up, but if, and this is also the marital communications privilege rather than the adverse spousal testimony privilege, I think there's a if it did apply in the circuit, it wouldn't even be relevant because there was a voluntary waiver. In fact, you know, and Mr. Brannick says that it was never determined where the social security number came from, but when he got on the phone with his wife, she said, I got it from the trash runs. So Mr. But what he's saying is you never did determine that he in fact got that neighbor's social security number from using the database. That's exactly right, but that wasn't the charge here ultimately. You didn't rely on that when he was discharged? No, that was not relied upon, and the Supreme Court has said that you can be charged with lying during the underlying investigation without ever actually proving that the misconduct that you were attempting to get at when the investigation was undertaken. So there's no evidence here that there was any sort of coercion or duress. In fact, when asked at the hearing before the board whether, you know, about this duress issue, Mr. Black admitted that there had been no prodding when he had disclosed the information about the trash runs. So he himself has conceded that there was no coercion or duress, and the type of duress that's contemplated in the cases Mr. Black cited in his brief like Davis has to do with when you're coerced into waiving your constitutional right to not just incriminate yourself by being held for 16 days or, you know, put in a room with no access to counsel. That's not what happened here. At any time, Mr. Black could have consulted with counsel. In fact, he had a three-hour break to do that. Also, I just have to touch briefly on Mr. Black's claim that he didn't know about the trash runs until the three-hour break on October 6th. I mean, the judge relied on more than just the inherent improbability of that to determine that it was not credible. When asked, why didn't you tell us this before by the investigators, he said, I wanted to protect my wife. He didn't say, oh, I just found out about it or anything like that. I mean, there was just no credibility to his assertion that he was totally unaware of these trash runs until October 6th when he was, and the administrative judge found, was a seasoned investigator who, when he knew he was under investigation, you would think he would try to information to support his claim that he had not used the databases. Also, in his brief, Mr. Black claims that the agency ultimately found that he had not used the databases. That's not entirely true. There were two databases that it was clear he had not used, but there was another one where the data to determine whether or not he had used it, this choice point database, they were never able to recover that. So that's why that charge wasn't sustained. With respect to the IDMS charge, there was substantial evidence to support that. Mr. Black admits that he performed the queries that were, that underlay the charge. He claims he was entitled to prior notification, but that's not true under Chapter 75. He's got the 30 days to which he was entitled. He said he wasn't, he was inadequately notified of the agency's expectations, but that's incorrect as well. He stipulated that the logon for the IDMS system says that it's not to be misused, that it's intended solely for the official use of the Department of Homeland Security, and that he was not to use it for personal gain. It was also testified that he got on-the-job training telling him that personal gain includes personal use. So there was substantial evidence to support the administrative judge's finding that when he queried Ms. Weisbrock, the woman who had filed the complaint against him, he had no official purpose to do that. He claimed it was for de-confliction purposes, meaning because he was a liaison with other federal agencies that he had to decide whether there was a conflict with respect to the investigators assigned, but she found that not credible. He could have gone up the chain of command to find out this information and should have known that in querying the person who had complained about him, he could compromise the investigation. That would not be an official use. With respect to the other individuals who we queried, most of whom were his superiors who were interviewed or were involved in the investigation of Mr. Black, the administrative judge sort of split her decision. There were a series of queries for which he could have had no possible official use other than looking into the investigation into himself, but there were some later queries that may plausibly have been supported by an event that this investigation of some border patrol agents that implicated these superiors that he may have had a possible legitimate reason to query. So those charges she didn't sustain. So she found the ones where he was inquiring about his supervisors to be... Some of them to be not authorized, and then she found some to be authorized. Or at least that there was insufficient evidence to sustain that it was improper. That's correct. I mean, key to it was that in... And he even admitted with respect to the Weisbrock queries that he'd looked at her in the system to see if there was anything he could do to get ready to meet with the investigators. Now, a seasoned investigator should know that you do not look at the investigative file to prepare to meet the investigators when that could compromise the investigation. And Mr. Black also claimed that the administrative judge didn't properly apply the Douglas-Fackers factors, but in her decision she sets out in detail why they did. Finally, with respect to one last issue, which Mr. Black didn't even mention, the abusive discretion denying the motion to compel, there was no abusive discretion there. The charge for which he was obtained information was a statutory charge. It was apples and oranges with the charge he was being... That was taken against him. There was a different burden of proof. There was a different penalty. So there was nothing in common, and she did not abuse her discretion. And I just... Unless the court has further questions, I'll wrap up, but I just want to make it clear that there was not an involuntary interview here by virtue of the fact that action could have been taken against him. And the Lachance and Bryson cases, the Supreme Court has made that crystal clear that in a civil case, even if some action can be taken against you for refusing to testify, that is perfectly justified. Thank you. Mr. Veronique. Thank you, Your Honors. Just briefly, as counsel mentioned, she noted that Mr. Black should have got together all the information that he believed the investigators would need when he walked in the interview. His understanding of the interview was that he was being investigated for misusing the government databases. He knew he didn't misuse the government databases as far as obtaining Ms. Weisbrook's social security number or date of birth, so he had no reason to confirm with his wife where she obtained the information. He knew that he hadn't used the government databases to obtain her information. As far as the charges in this case, as far as the misleading information charge is concerned, there was no material misrepresentation. As far as any type of allegation, he misled the investigators. It was either that his wife obtained it from the internet or his wife obtained it from the trash runs, but that's immaterial as far as the agency is concerned. There was no misconduct as far as his part, as far as obtaining that information. One thing that counsel said as far as Mr. Black consulting with counsel on the day of the interview, the counsel he consulted with was the agency counsel to confirm that the EPA investigators still had the right to conduct the interview. He did not consult with any private counsel. In fact, during the administrative interview, he did not have the right to have an attorney present. He did not have the right to have representation present because he's in a non-bargaining status. With that, I notice that my time is up. Thank you, Your Honors. All right. We thank both counsel. The appeal is submitted. The honorable court will be adjourned tomorrow morning at 10 o'clock a.m.